State v. Frazier.

THE STATE v. FRAZIER, *Appellant.*

Division Two, February 2, 1897.

1. **Criminal Law**: HOMICIDE: MURDER: PRESUMPTION. Where a homicide occurs and nothing more appears, it will be presumed to be murder in the second degree.

2. ———: PRACTICE: MURDER: INSTRUCTIONS: VERDICT. In a prosecution on an indictment charging murder in the first degree, where there is evidence to support it, and the plea is self-defense, it is not error to instruct on murder in the second degree, and the jury may, in such case, convict of murder in the second degree, under the provisions of section 3949, Revised Statutes, 1889, declaring that defendant may be convicted of any inferior grade of the offense charged, and any person convicted of murder in the second degree shall be punished according to the verdict, although the evidence shows him to be guilty of a higher degree of homicide. (R. S. 1889, sec. 4115.)

3. ———: ———: MURDER IN THE FIRST DEGREE: PROSECUTION FOR MURDER IN SECOND DEGREE. In a prosecution on an indictment for murder in the first degree, the prosecuting attorney may, before the trial begins, or, during the trial, enter a *nolle* as to murder in the first degree and elect to prosecute for murder in the second degree.

4. ———: ———: CONFLICTING INSTRUCTIONS: ESTOPPEL. A defendant will not be heard to complain that a correct instruction given for the state is in conflict with one too favorable to him given at his request, under Revised Statutes 1889, section 4115, providing that a defendant can not avail himself of error committed at his instance or in his favor.

5. ———: ———: FAILURE OF COURT TO GIVE NECESSARY INSTRUCTIONS: EXCEPTIONS: GOOD CHARACTER. Where a defendant does not except to the failure of the court to instruct upon the question of his good character, at the time the instructions were given, he will not be heard to complain of such failure on appeal.

6. ———: ———: INSTRUCTIONS. The practice of giving numerous and unnecessary instructions, condemned.

*Appeal from Platte Circuit Court.*—HON. W. S. HERNDON, Judge.

AFFIRMED.

ON conviction of murder in the second degree, ten years in the penitentiary was awarded defendant. The indictment charged defendant with murder in the first degree, in that he had shot his father-in-law, Jacob Oxford, to death with a pistol on the sixth day of October, 1895.

The testimony upon the part of the state tends to show that on the morning of the sixth of October, 1895, and for some time prior thereto, the defendant had been married to deceased's daughter, May, and that the deceased and his family lived in the same neighborhood in Platte county, not far from Settle's Station. On this morning Logan and Clark, the two sons of the deceased and brothers-in-law of the defendant, had been over to a neighbor's by the name of Coughman for the purpose of getting shaved preparatory to going

over to Goose Neck; that upon their return, as they passed by the house of the defendant, defendant called Logan and said: "You go down and tell the old man to come up here; I want to talk matters over with him," when Logan replied: "You and pa'll have some difficulty; I had better not tell him anything about it." Defendant replied: "I have said things about him I want to apologize for; I want to talk the matter over and forever live in peace."    *    *    *    "I want May to come home," whereupon Logan replied: "I will go down and tell him."

Logan immediately went down to his father and told him what the defendant had said, to which his father replied: "All right, I do not believe in living in war with no man;" and he and his father then went to Frazier's house. Upon arriving his father said: "Jim, I come up to talk the matter over with you; I do not believe in living in war with anybody;" that Jim opened the door and came out saying: "I sent for you to kill you, you G—d d—d son of a b—h;" that he immediately fired two shots from his pistol; that old man Oxford fell saying: "O, Jim, you have killed me," and immediately died. Logan immediately started for the defendant, when he turned and snapped his pistol at him, ran into the house, secured an old musket, came back and attempted to strike Logan with it; that Logan attempted to strike him with his pocket-knife, which he had drawn from his pocket and opened after the defendant had snapped his pistol at him. When the defendant ran back into the house for his musket, Logan called to his brother, Clark, who was some distance back from the Oxford home, to go and get the rifle and bring it quick, and when Clark got the rifle and returned Logan and defendant had both disappeared and his father was lying there dead.

The testimony shows that both of the shots from defendant's pistol struck the deceased, the first entering the chest in front, passing through the chest lodged under the left shoulder blade; the other entering the front of the abdomen and passing entirely through.

Witness English testified that the defendant told him two or three days before the killing that he "was in a little family trouble, and inside of twenty-four hours there would be a corpse."

Witness Frye testified that on October 1, before the killing, the defendant told him if his wife did not come back to him he was going to kill the d—d son of a b—t. On the Saturday night before the killing on Sunday morning, he said: "Bill, you are going to hear something popping around here." "I will never rest contented until I kill Mr. Oxford."

Witness Dillingham testified that the defendant told him a few days prior to the killing that he intended to kill old man Oxford, and get him out of the way.

Dr. Walker testified that about a week before the killing in conversation with the defendant, the defendant said to him: "I will kill the G—d d—d son of a b—h."

It is further shown that the defendant had driven his wife, the daughter of the deceased, away from home, and that she had taken refuge and shelter at the home of her father; that when the wife of the deceased advised him that he ought not to allow his daughter to return, that he said she was his child, and had nowhere to go, and that as long as he had a home that she might come there.

It is further shown that neither old man Oxford nor his sons, Logan and Clark, had any arms or weapons of any character when they went to the Frazier home that morning, except Logan's small

pocketknife.    The  reputations  of  both  the  Oxford
boys were shown to be good and also to be bad.

The evidence offered on behalf of the  defendant,
adopted from the  statement  of defendant,  is in sub-
stance and effect the following:

May Frazier testified that she is wife of the defend-
ant, that she was at her father's house the day  he  was
killed by defendant; went to her father's  house  about
three weeks before the killing; her husband  had  come
home drunk and it made her mad, and she went to her
father's house; her father would not permit her  to  re-
turn to her husband, and told her  if  she  returned  he
would kill her and defendant both.   He said if witness
went back to live with defendant, he would kill defend-
ant before morning and burn the house down over her
head.   He said he wanted her  to  get  a  divorce  from
defendant, and then he  would  marry  her  to  old  man
Fry, and then he would kill Fry and he would have all
of his property;  her brother,  Logan Oxford,  brought
an  old  musket  home  with him  the  day  before  the
killing, and her father shot it off, then  loaded  it  with
rifle balls and  powder;  her father told Logan to put in
a  big load, as there was going  to  be  war  on  the  Fry
farm;  on Sunday morning, of the killing, her brothers,
Clark and Logan Oxford,  came home and  began  talk-
ing to deceased at the hogpen; witness  heard  deceased
say:   "Let  him  run  his  attachment  and  be  God
damned, I want to kill him."   Witness then went into
the house.   Deceased came into the house and reached
behind the bureau and got the  old  musket  and  said:
"God damn Frazier and his lousy soul.   I  am  going
to kill him."   Witness caught deceased and he  jerked
away from her.   Deceased went out with the  musket
and met her brother, Clark, who told  him  to  put  the
gun down and not go to Frazier's;  that Frazier  would

not take what he had taken before. Deceased said: "Do you suppose I am afraid of that God damned, cowardly son of a bitch. You get that rifle and come on." Deceased hurried on toward defendant's. Clark followed him and she followed after them. She did not see Logan start with deceased. She caught up with Clark when deceased was about half way up to defendant's house. Logan was with deceased, and deceased turned around and said to Clark: "Come on, God damn him, we are going to kill him." When deceased got in front of defendant's house, he raised the musket in both hands and said: "God damn you, I am going to kill you this morning," and next witness heard two pistol shots, and deceased fell. Logan yelled to Clark to come on with the rifle, and Clark said he did not have it, but for Logan to get the musket and keep defendant in the house till he got his rifle. Witness started back to deceased's house, and on the way met Clark coming back with the rifle. Went into the house to her baby, and her mother asked her if pa had killed Jim. She told her Jim had shot pa. Witness went back to where deceased lay, and knelt down by him. Heard Clark say: "Where did Jim go?" "Clark was there working with pa." Logan was standing in the yard with a corn knife in his hand. He said Jim went off west. He said he did not see why that damned old musket did not go off. He said if them bullets had gone through Jim they would have torn a hole you could throw a cat through. Clark said: "We will have to make some excuse for pa being killed at Frazier's." Logan said he would tell that he went to Frazier's house and that Frazier told him to tell his father to come up and they would have a peaceable settlement; that they would live in peace. Clark said that was about as well as they could fix it up. He turned and picked up this old musket, that

was lying in the yard and told witness to take it home and hide it, as he wanted no one to see it. She carried the musket home and put it in the loft. She did not return to defendant's house any more.

At the time defendant shot deceased witness did not see defendant. The deceased had advanced to the door of defendant's house and had the musket pointing in the door. Heard deceased then say to defendant he had come to kill him. Logan was standing by his side with a corn knife in his hand. Clark brought the corn knife home and stuck it in the hen house. The day after the preliminary trial Logan asked her for the old musket. He said his pa had fallen on it when he was shot, and that he guessed there was blood on it. He said he wanted no blood found on it. He then washed the blood off, and she put it back in the loft. Logan and Clark Oxford threatened to kill witness if she did not tell what they wanted her to tell about the killing. She had made statements in the prosecuting attorney's office, in the presence of her brothers, which she was compelled to make under threats of her brothers.

George Able testified that he was on the Fry farm the day of the killing of Jacob Oxford. He passed by Oxford's house that morning on his way up to Tom Brown's, and when in about one hundred and fifty yards of the house he heard deceased talking in a loud voice and say: "I am going up there this morning." Witness went up to Brown's, and found him not at home, and started back. When he was passing in about one hundred and fifty yards of defendant's house he heard deceased's voice saying: "God damn you, I am going to kill you this morning" two times, and next heard two shots fired. Witness could not see the parties on account of the timber and brush. Knew deceased's voice. He went home, and some time

after that Logan Oxford came after him to go up where his father was killed. He started, and when between the house of deceased and defendant's house he saw Clark Oxford coming from towards defendant's house with a corn knife, which he stuck into a hen house near deceased's house.

Tom Brown testified that he lived on the Fry farm; that he was at George Able's on the morning deceased was killed, and that Logan Oxford came for Able and told him his father had been killed, and wanted them to go up to help take care of him. They started up, and went by deceased's house, and saw Clark Oxford, with a corn knife in his hand, pass from towards defendant's house towards deceased's house, but witness did not see what he did with the corn knife. He came along through the corn. When they got to where deceased lay they found Mr. Coughman and Logan Oxford there. Clark Oxford was not there at the time.

Jim Irwin testified that he lives a quarter of a mile from the Fry farm, where deceased lived; that he saw Logan Oxford the day before the killing, at about sundown, and he had the old musket on his shoulder, and said he had tried to trade it to the Woodard boys; saw him going towards deceased's house with the musket.

Eugene Woodard testified that he lives adjoining the farm where deceased lived; on Saturday, the day before the killing of Oxford, Logan Oxford and defendant came over to his place, and Logan had an old musket which he wanted to trade for a violin. Witness had sold the musket to the Oxford boys some time before, and Logan told him then that he had traded it to defendant, for fifty cents and to have his horse shod, but that defendant had left his shop and he had to have his horse shod elsewhere; and that he

had given Mr. Frazier back his fifty cents and had taken the gun back; that it was now his gun.

Ben Woodard testified that he and his brothers, Jim and George, were in the potato patch at their place adjoining the place where deceased lived, on Saturday before the killing, and that defendant and Logan Oxford came there, and Logan wanted to trade the old musket for a fiddle. Logan spoke of having traded the gun to defendant, but that he had gotten it back.

James Woodard testified that he lives on the farm adjoining the place where deceased lived, and that on Saturday before the killing Logan Oxford and defendant came into the potato patch where he and his brothers, Gene and Ben Woodard, were working, and had an old musket which he wanted to trade for a fiddle. It was a musket his brother, Gene Woodard had traded to Logan Oxford. Logan said he had traded it to defendant, but had traded back for it. Logan wanted to trade it to Ben Woodard for a fiddle. He offered to trade the gun to witness for a pair of boots. They made no trade, and Logan carried the gun away with him.

James Thomas testified to the fact that he went to deceased's house shortly before the killing to get some stock that he had traded for from defendant, and met deceased, who told him that he could whip defendant, and that if any one got the stock he would put a bullet through him.

James Miller testified that he was at the house of deceased on Monday morning after the killing, and that he noticed a corn knife sticking in the chicken house.

T. L. T. Jones testified that he had a conversation with deceased shortly before the killing, and that deceased said he could take a shotgun and run defendant away from his house.

James M. Frazier, the defendant, being sworn in his own behalf, testified that at the time of the killing of Jacob Oxford, he was living on the John Marion Fry farm; deceased had a lease on the farm from Fry. Two or three weeks before the trouble his wife left him and went up to her father's. He stayed at home Saturday night before the killing. An old man by the name of Fye stayed all night with him. Defendant got up Sunday morning and ate his breakfast and knocked around awhile and lay down to take a nap and fell asleep. He was waked up by his little dog barking. He went to the door, looked toward Oxford's. He heard loud talking down there. He lay down on the bed again. He had not lain there long before he heard loud talking again, and looked up and saw them, Mr. Oxford and Logan. He heard Clark Oxford's voice say: "Look in and see if there is anybody in there with him." They were approaching defendant's door. Deceased had a musket and Logan had a corn knife. Deceased had the musket presented toward the door. Defendant got up from the bed. He had a revolver under the head of the bed. He took it with him to the door. He did not know what this all meant, and deceased said: "God damn you, I am going to kill you this morning." At that minute he snapped the musket at defendant and it failed to go off. He proceeded to pull the hammer back again, and defendant shot him two times. Clark called to Logan to cut defendant's arm off. He cut defendant on the arm. Deceased fell on the gun, and Clark hallooed to Logan to get the gun and keep defendant in there. Logan started to get the gun, and defendant told him to leave there, and he left around the house. He pulled the gun from under the deceased, and bent it over the door sill. When he heard deceased first say, "God damn you, I am going to kill you this morning," he was from five to seven

feet from the door of defendant's house. When he
shot, the gun was presented inside of defendant's door
and within three or four feet of defendant's breast.
He came to Platte City and gave himself up to the
sheriff.   He did not come direct to Platte City.   He
stayed in the woods all day for fear those boys would
shoot him, but he came to Platte City the next morn-
ing.   He traded for the old musket with Logan Ox-
ford.   He was to shoe his horse and give him fifty
cents for the gun.   He was away from his shop some,
and one day he came to have his horse shod and he
had it shod over at Woodruff.   On Saturday before the
shooting, Logan came to defendant's house and told
him about it, and said he would take the gun back and
give defendant the fifty cents back.   He gave defend-
ant the money and took the gun back.   Witness told
him he was going over to Woodard's to trade for a
buggy, and also that Jim Irwin had a buggy that he
wanted to trade for.   Logan went with him and carried
the musket, and  said maybe he could trade it off over
there.   They went over to Woodard's potato patch,
where Eugene, Ben, and Jim Woodard were working.
Logan asked them what they had to trade on.   He
offered to trade the gun for a fiddle, but they did not
trade.   Logan told them he had traded back for the
gun.   They came out on the road again and met Jim
Irwin, and defendant looked at his buggy and did not
trade.   They went on down the road till they came to
the gate that went into deceased's place, and Logan
went in there with the gun, and defendant went on
home.   That was the last he saw of the musket until
Sunday morning, when deceased came to defendant's
house with it.   He did not snap the musket at Logan
Oxford after the shooting of deceased.   He does not
remember having any conversations with Mr. Dilling-
ham nor Dr. Walker, or of making any threats against

the deceased.   He did not desire to shoot him at all.
If he said it, he was under the influence of liquor and
he didn't remember it.   He doesn't say he did not say
it, but he had no remembrance of it whatever.

T. L. T. Jones, P. A. Ballard, J. M. Miller, Jona-
than Miller, and Michael Farrington testified as to the
good character of the defendant.

Upon cross-examination the wife of the defendant
admitted making a different statement of facts to the
prosecuting attorney, but she claimed that she made
such statement under threats of personal violence from
her brothers, and in rebuttal it is shown by a number
of witnesses that she had stated that her husband had
shot and killed her father in cold blood; had made
statements which were in harmony with the testimony
of the Oxford boys, and corroborated their testimony
in the most minute detail.   It is also shown by a num-
ber of witnesses who examined the alleged cut from the
corn knife on the arm of the defendant that it was in
all probability a self-inflicted scratch with the finger
nail.

At the close of the testimony defendant asked the
following instructions, which the court refused to give:

"1.   The defendant stands charged in the indict-
ment with murder in the first degree, and under the
evidence in this case the jury must convict the defend-
ant either of murder in the first degree, or acquit him
on the ground of self-defense.

"2.   The court instructs the jury that mere threats
to kill do not constitute a crime; and a threat amounts
to nothing unless there is an attempt made by some
overt act to execute it; and even if the jury believes
from the evidence that the defendant had threatened
to kill the deceased, yet they should wholly disregard
any threat of defendant unless they are satisfied from
the evidence, beyond all reasonable doubt, that the

·defendant made the first demonstration during the difficulty to use a dangerous weapon to do bodily harm, or that he shot deceased without justifiable cause, as defined in these instructions."

To the refusal of which instructions defendant at the time excepted. And thereupon the court gave the following instructions for the defendant:

"3. The court instructs the jury that, where danger is threatened and impending, a person is not compelled to wait until it is too late to prevent the danger. If, therefore, the defendant at the time he shot the deceased had reasonable cause to apprehend from deceased, and did apprehend, immediate danger of being killed or of receiving some serious injury to his person by the deceased, and to prevent such apprehended danger he shot the deceased, then they must acquit the defendant on the ground of self-defense. And if the defendant acted in a moment of apparently impending danger, from an assault by deceased, it was not necessary for him to nicely gauge the proper quantity of force necessary to repel the assault; and it is not for you to decide while investigating this case, whether or not it was really necessary for defendant to kill deceased in order to save himself from death or great bodily harm; and it is not the question here as to what you may think was necessary for the defendant to have done at the time he shot deceased, but the question for you to determine is, what the defendant might reasonably have believed necessary for him to do under the circumstances. And to justify the killing on the ground of self-defense, all that is necessary for you to believe is, that the death of Jacob Oxford resulted from the defendant's reasonable defense of himself, and if you so believe, then you should acquit him on the ground of self-defense.

"4.   The right of any person to defend himself against danger not of his own seeking, is a right which the law not only concedes, but guarantees to all men. The defendant may therefore have killed the deceased and still be innocent of any offense against the law. If, at the time he shot the deceased, the defendant had reasonable cause to apprehend on the part of the deceased a design to do him some great personal injury, and there was reasonable cause for defendant to apprehend immediate danger of such design being accomplished, and to avert and prevent such apprehended danger, he shot the deceased, such shooting was not felonious, but was justifiable, and you ought to acquit him upon the ground of necessary self-defense.   It is not necessary to this defense that the danger should have been impending and immediately about to fall, or that it should have been actual or real.   All that is necessary is that the defendant had reasonable cause to believe, and did believe, these facts."

The court gave the following instructions on the motion of the state:

"1.   If you believe from the evidence that the defendant, in Platte county, Missouri, on or about the sixth day of October, 1895, with a certain pistol, willfully, deliberately, premeditatedly, and of his malice aforethought, shot Jacob Oxford, and that said Jacob Oxford thereafter and prior to the filing of the indictment in this case, to wit, December 6, 1895, died from the effect of said pistol shot, then the jury will find the defendant guilty of murder in the first degree, and will so state in their verdict.

"2.   If the jury believe from the evidence that the defendant in Platte county, Missouri, on or about the sixth day of October, 1895, with a certain pistol, willfully and with premeditation and malice aforethought, but without deliberation, shot Jacob Oxford, and that

said Jacob Oxford thereafter and prior to the filing of the indictment in this case, to wit, December 6, 1895, died from the effects of said pistol shot, then the jury will find the defendant guilty of murder in the second degree and assess his punishment at imprisonment in the penitentiary not less than ten years.

"3. The court instructs the jury that if they believe from the evidence that defendant intentionally killed Jacob Oxford by shooting him with a loaded pistol, and that such killing was murder in the second degree, in the absence of proof to the contrary, and it devolves upon the defendant to adduce evidence to meet or repel that presumption; unless it is met or repelled by evidence introduced by the state.

"4. The court instructs the jury that 'willfully' as used in these instructions, means intentionally, not accidentally; and, in the absence of qualifying facts and circumstances, the law presumes that a person intends the ordinary and probable results of his acts and conduct.

"5. The court instructs the jury that 'malice aforethought,' as used in these instructions, means that the act was done with malice and premeditation. 'Premeditation' means thought of beforehand, for any length of time, however short.

"6. The court instructs the jury that 'malice,' as used in the foregoing instructions does not mean mere spite, ill will or dislike, as it is ordinarily understood; but it means that condition of the mind which prompts one person to take the life of another without just cause or provocation, and it signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief.

"7. The court instructs the jury that 'deliberately' means in a cool state of the blood; it does not mean brooded over, or reflected upon for a week or a day, or

an hour; but it means an intent to kill, executed by the defendant in a cool state of the blood, in furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose and not under the influence of a violent passion suddenly aroused by some provocation.

"8.    The court instructs the jury that if the killing was done willfully, premeditatedly, and deliberately, with means and instruments likely to produce death, then the malice requisite to murder will be presumed; and if the jury believe and are satisfied from the evidence beyond a reasonable doubt the defendant shot and killed said Jacob Oxford, willfully, maliciously, premeditatedly, and deliberately, with an instrument likely to produce death, then it devolves upon the defendant to adduce evidence to meet and repel such presumption.

"9.    The court instructs the jury that in order to convict the defendant of murder in the first degree, you must believe and find from the evidence that defendant not only shot deceased Jacob Oxford intentionally, but that he shot intending to kill him.    In this connection, however, you are further instructed that in the absence of qualifying facts and circumstances, a person is presumed to intend the natural, ordinary, and probable result of his acts.    Wherefore, if you believe from the evidence that the defendant intentionally shot Jacob Oxford, deceased, in a vital part with a deadly weapon, to wit, a loaded pistol, from which death ensued within a day and a year thereafter, you will find that he intended to kill said Oxford, unless the facts and circumstances, given in evidence, show to the contrary.

"10.    The court instructs the jury that if they believe from the evidence the defendant to be guilty of either degree of murder but entertain a doubt as to the degree, you should give defendant the benefit of the

doubt, and find him guilty of murder in the second degree.

"11. The court instructs the jury that in any statement of the defendant, Frazier, proved by the state or testified to by himself, what he said against himself, the law presumes to be true, because said against himself, and what he said for himself, you are not bound to believe, but may accept or reject as you may see fit.

"12. The court instructs the jury that they can not acquit the defendant on the ground of self-defense, unless they believe from the evidence in the case, on both sides, that defendant, Frazier, had reasonable ground to believe, and did believe, that deceased, Jacob Oxford, was about, then and there, to take his (defendant's) life, or do him some great bodily harm, and that the danger of his doing so was then imminent and impending; and in this connection the court further instructs the jury that if defendant did not have reasonable cause to believe, and did not believe, that, at the time and place of the killing as set forth in the indictment, that such danger was imminent and impending, and if they believed from the evidence that defendant could, with safety to himself, have avoided shooting and killing Jacob Oxford, at the time, and by the means mentioned in the indictment, he did, but notwithstanding, he could have avoided thus shooting and killing, he then and there willfully, feloniously, on purpose and of his malice aforethought, as heretofore defined in these instructions, but without deliberation, with a pistol, as set forth in the indictment, shot and killed Jacob Oxford, you will find him guilty of murder in the second degree, and assess his punishment as hereinbefore provided.

"13. The court instructs the jury that to justify the killing of Oxford by the defendant it is not suffi-

cient that defendant may have acted upon an honest belief that danger was impending to his life, or that deceased was about to inflict great personal injury to defendant, but it must appear he had reasonable cause to apprehend danger, real and imminent, at the time of the killing, and the jurors herein are final judges of the reasonableness of his apprehensions.

"14. The court instructs the jury that the statutes of this state allow a wife to testify for her husband, but such fact may be shown for the purpose of affecting her credibility.

"15. The court instructs the jury that if they believe from the evidence that Jacob Oxford, the deceased, was invited by the defendant, Frazier, to go to his (Frazier's) house on a mission of peace, and having arrived at said house, without any fault on the part of said Oxford, was attacked and shot to death by the defendant, Frazier, with a certain pistol, alleged in the indictment, at the time and place mentioned in the indictment, and that said killing was done willfully, deliberately, premeditatedly, feloniously and of his malice aforethought, as defined in the foregoing instructions, then the defendant, Frazier, is guilty of murder in the first degree, and you will so state in your verdict.

"16. The court instructs the jury that deliberation and premeditation, necessary to constitute murder in the first degree, may be inferred from all the facts and circumstances of the case, as detailed in evidence, provided it can be done beyond a reasonable doubt.

"17. The court instructs the jury that if they believe from the evidence that defendant threatened the life of Jacob Oxford, then the fact of his so doing may be taken into consideration by the jury in passing upon the guilt or innocence of the defendant, but such alone are not sufficient to justify a conviction.

"18. Not given by the court.

"19. The court instructs the jury that before they can convict the defendant they must believe and be satisfied of his guilt beyond a reasonable doubt. In this connection, the court further instructs the jury that to authorize you to acquit upon reasonable doubt alone, such doubt must be a substantial doubt of defendant's guilt, and not a mere possibility of the defendant's innocence.

"20. The jury are the sole judges of the weight of the evidence, and credibility of the witnesses. In weighing the testimony of any witness the jury should take into consideration the interest of the witness in the event of the case, as a party or otherwise; the manner or conduct of the witness upon the stand; any feeling or motive which may have influenced the witness in testifying; the probability or improbability of the testimony of such witness, in view of all the evidence, facts and circumstances surrounding the case; and should give to the testimony of each witness such weight as, under all the evidence and surroundings, they think it entitled to.

"If the jury believe that any witness has willfully sworn falsely to any material facts in the case, they are at liberty in the exercise of their judgment to disregard all or any part of the testimony of such witness.

"21. The court instructs the jury that you should consider all threats, which you may believe from the evidence were made by the deceased against the defendant, and give them such weight in determining the nature of the transaction giving rise to the charge for which defendant is now on trial, as you deem proper; mere threats, however, will not justify on the ground of self-defense the shooting alleged in the indictment, nor will threats alone warrant the party against whom they are made in attacking and killing the party who made them.

"22.   The court instructs the jury that the defendant is a competent witness in this case, and you must consider his testimony in arriving at your verdict; but in determining the weight and credibility you will give to his testimony in making up your verdict, you may take into consideration, as affecting his credibility, his interest in the result of the case, and that he is the accused party on trial, testifying in his own behalf.''

To the giving of which instructions on behalf of the state, the defendant excepted at the time.

The result of the trial was that already stated, and after the usual motions made and denied, defendant appealed to this court.

*N. B. Anderson, W. H. Roney,* and *J. W. Coots* for appellant.

(1) Under the undisputed evidence in this case, the defendant was either guilty of murder in the first degree, or should have been acquitted on the ground of self-defense, and the court erred in refusing to give instruction number 1, as prayed by defendant. Instructions must be confined to the case as made out by the testimony. *State v. Hopper,* 71 Mo. 425; *State v. Talbot,* 73 Mo. 347; *State v. Patterson,* 73 Mo. 713; *State v. Sneed,* 91 Mo. 559; *State v. Wilson,* 88 Mo. 13; *State v. Brady,* 87 Mo. 142. On a trial for murder, where the testimony for the state shows a deliberate and premeditated homicide, and that for the defense, a clear case of self-defense, instructions should not be given for a lower grade of homicide than murder in the first degree. *State v. Smith,* 114 Mo. 406. Where defendant did not deny intentional shooting, but justified on the ground of self-defense, he is either guilty as stated or justified and the court should refuse to instruct the jury on any lower grade of the offense than that charged in the indictment. *State v. Doyle,* 107

Mo. 36.   The criminal annals of this state afford a no more striking instance than is presented in this case of an attempt to compromise away the liberty of a citizen and convict him of a crime with which he was not charged and to sustain which no evidence was adduced. (2) The failure of the court to instruct as to the good character of the defendant in this case, was a fatal error, that should call for a reversal and a new trial. Whenever it would be the duty of the court upon a proper request to instruct the jury upon any material question of law arising on the evidence, it is equally obligatory upon it to instruct upon such matters whether requested or not.   *State v. Taylor*, 118 Mo. 180; *State v. Nelson*, 118 Mo. 124; *State v. Patrick*, 107 Mo. 147. In the case of *State v. Hilsabeck*, 132 Mo. 360, and a long line of decisions of this court, it is held that a failure to instruct as to the good character of the defendant is not a fatal error, unless requested by the defendant, and an exception saved to the court's failure to so instruct. An inspection of all those cases will show that the facts involved arose prior to the amendment to section 4208, Revised Statutes 1889, by an act approved April 9, 1895.   Acts of 1895, page 164. By this amendment, it is mandatory on the trial court to instruct on the question of good character, whether asked or not.   This amendment was doubtless enacted in response to the opinion of Judge SHERWOOD in case of *State v. Murphy*, 118 Mo. 17.

*R. F. Walker*, attorney-general, and *F. M. Wilson*, prosecuting attorney, for the state.

(1) The allegation in the motion for new trial that the verdict in this case is not supported by the law and the evidence is without foundation upon this record;

the verdict is in harmony with the law as declared by
the court, and the testimony shows overwhelmingly the
guilt of this defendant.    (2) It is alleged that the jury
were permitted to separate and were not kept in some
private place during their deliberations; that they were
permitted to pass and repass the jail door where they
could see the prisoners and officers passing and repass-
ing. The record in this case does not support this con-
tention; in fact, there is not a word in the entire
record which would warrant or authorize this allegation,
and inasmuch as allegations in motions for new trial do
not prove themselves, this alleged error will not be
reviewed by this court.    State v. Foster, 115 Mo. 448.
(3) While it is evident from reading the instruc-
tions that too many in number were given and a num-
ber were given that were more favorable to the
defendant than authorized by the law, yet when read
together, it will be observed that they correctly declared
the law and were neither misleading nor confusing.
The twenty-two given upon the part of the state are in
the usual and approved forms and are not subject to
the objections urged by counsel for defendant.    Num-
ber 1 has been asked and given as many times as have
defendants been tried for murder in the first degree in
this state.    It defines that degree correctly.    However,
defendant not having been convicted of that offense he
can not complain.    State v. Kelly, 85 Mo. 143; State v.
Williams, 68 Mo. 110.    Number 2 is the usual stereo-
typed instruction as to murder in the second degree.
It was wholly unnecessary for the court to incorporate
in these instructions the definitions of the technical
words used.    They were properly and correctly defined
in instructions numbered 4, 5, 6, and 7.    It was wholly
unnecessary for the court to attach or use the phrase
"reasonable doubt" in the third, eighth, and ninth
instructions.    Instruction number 19 as to reasonable

·doubt was sufficient. Nor can it be said that instruc-
tion number 15 was objectionable for the reason that it
commented upon the testimony. Instruction number
13 was in the usual form and properly given. It was
not in conflict with instruction number 4 given on the
part of the defendant. Instruction number 12 correctly
declared the law and was in harmony with number 3
given upon the part of the defendant. Under the tes-
timony in this case it was the duty of the court to give
an instruction for murder in the second degree, and a
failure so to do would have constituted reversible error;
hence the court very properly refused to give instruc-
tion number 1 upon the part of the defendant. In-
struction number 2 asked by the defendant was prop-
erly refused, because it was not the law; it told the
jury in effect that it could not consider any of the
threats, unless they were satisfied that the defendant
made the first demonstration, during the difficulty, to
use a dangerous weapon. It was proper for the jury to
consider the threats for the purpose of ascertaining
who was the aggressor and who brought on the diffi-
culty.

SHERWOOD, J.—The vain repetitions in which the
heathen indulge when making their prayers, finds a
full equal, if not a superior, in the instructions given
in this case, twenty-three in number and covering
nearly eight printed pages.

There is in the old arithmetics a chapter entitled
*"Permutations"* in which is taught how often the changes
can be rung on the location of a given number of ob-
jects. This chapter would appear to have been con-
sulted before the foregoing instructions on self-defense
were drawn. But "what can't be cured must be en-
dured," and so we have to travel over the superficial
area of these instructions as did the trial jury in the
court below.

Proceeding then to consider the instructions which have been assailed:

Presumptively, when a homicide occurs, and nothing more appears, the crime is murder in the second degree. And the jury may have disbelieved a portion of the testimony as to deliberation, and believed the existence of the other elements necessary to constitute murder in the second degree. And in the direct conflict between so many of the witnesses on the part of the state, and so many on the part of the defendant, it was perhaps the best thing the trial court could do, to give an instruction for murder in the second degree. If the trial court had given the first instruction asked by defendant, and it had been obeyed by the jury, the defendant must have been acquitted and discharged notwithstanding the jury may have believed him to have been guilty of murder in the second degree.

Our statute provides that the jury may find a defendant not guilty of the offense charged in the indictment, and may find him guilty of any inferior grade of such offense, and any person found guilty of murder in the second degree, shall be punished according to the verdict, although the evidence shows him to be guilty of a higher degree of homicide. Sec. 3949, R. S. 1889. And section 4115, *Ibid.*, contains a similar provision as to punishment for a lower grade of offense than the one in evidence shows the accused to be guilty of, and prohibits the judgment from being in any manner affected by reason thereof.

Besides, the prosecuting attorney before the trial began or during the trial might, at his own option, have entered a *nolle* as to murder in the first degree, and elected to try defendant for the next lower grade of that offense, in which case the situation would be precisely as now presented, and certainly the jury would not then have been authorized to acquit unless

they found defendant guilty of murder in the first degree, and yet the facts in evidence must have been the same. For these reasons we hold that no error occurred in the refusal of instruction number 1 asked by defendant, and in giving an instruction for murder in the second degree.

It is claimed that instruction number 13 given for the state is not the law and is in direct conflict with instruction number 4 given at the instance of defendant. Instruction number 13 is in entire accord with numerous instructions heretofore approved by this court, and if instruction number 4 given for defendant and at his instance was at variance with instruction number 13, it was because the latter was right and the former wrong, and because instruction number 4 was more favorable to him than it should have been, but under our statute a defendant can not avail himself of an error committed at his instance, or in his favor. Sec. 4115, R. S. 1889.

A like objection is made to instruction number 12 for the state on the ground that it is not the law, and besides at variance with instruction number 3 given for defendant as to which similar observations are applicable as those just previously made as to conflict between other instructions.

It is urged that the court failed to instruct the jury as to all questions of law, etc., and especially as to good character. It has been the law in this state for many years, and especially since the enactment of section 1908, Revised Statutes 1879, now section 4208, Revised Statutes 1889, requiring the court to instruct the jury on *all* questions of law, etc. But this court held all questions of law did not include *character* though it was entirely proper to instruct on it if requested. In 1895, the legislature believing that character *was* embraced in the word "*all*," pointedly en-

acted that an instruction should be given on that topic, whenever necessary. But this edition did not make the law any more mandatory than it always had been. The only difference in opinion was whether "character" was embraced in the words "all questions," etc. This being true, as defendant did not when the instructions were given, except because the court had not instructed the jury on all questions, etc., he can not avail himself of any failure if there was one in this regard. *State v. Cantlin*, 118 Mo. *loc. cit.* 111; *State v. Paxton,* 126 Mo. 500; *State v. Nelson*, 132 Mo. 184; *State v. Hilsabeck, Ibid. loc. cit.* 358.

As to the multiplicity of instructions given in this instance of which counsel for defendant complain, we can only say that we have remonstrated in vain with the trial courts on this subject, and that we are powerless to correct the evil. So long as the instructions do not palpably conflict as above explained, it will be no cause for reversal, though they be "as the sands by the sea-side for multitude." As the evidence is abundant in the record to authorize a conviction, and as we have discovered no substantial error, we shall affirm the judgment. All concur.