THE STATE v. NELSON, *Appellant.*

Division Two, January 21, 1896.

1. **Practice, Criminal**: INSTRUCTIONS: EXCEPTIONS: MOTION FOR NEW TRIAL: APPEAL. Instructions given on a trial for murder will not be reviewed on appeal where no exceptions were saved to the giving of them in the motion for new trial.

2. ———: ———: ———: APPELLATE PRACTICE. The objection that the trial court failed to instruct the jury upon all questions arising in the case, as required by Revised Statutes, 1889, section 4208, can not be raised in the appellate court, on appeal from a conviction of murder, unless exception is saved to such failure at the time it occurred in the trial court.

State v. Nelson.

3. ———: CAPITAL CRIME: SERVICE OF COPY OF INDICTMENT: WAIVER. If a defendant in a capital case pleads to the indictment without objecting to the failure of the clerk to furnish him with a copy of it forty-eight hours before arraignment, as required by Revised Statutes, 1889, section 4138, he waives his right to such service and can not afterward reassert it.

4. ———: OBJECTIONS TO EVIDENCE, GROUNDS OF: EXCEPTIONS. Objections to evidence will be unavailing on appeal where the grounds thereof were not stated.

5. ———: OATH OF SHERIFF. The recital in the record that "the oath required by section 4210, Revised Statutes, Missouri," was "administered to the sheriff and his deputies" sufficiently shows that the special oath required by said section was taken by such officers.

6. ———: INFANT WITNESS, COMPETENCY OF: JUDICIAL DISCRETION. Section 8925, Revised Statutes, 1889, declaring children under ten years of age, who appear incapable of receiving just impressions of the facts and relating them truly, incompetent to testify, fixes no minimum age at which infants shall be regarded as incompetent to testify, on account of tender years, but their competency is a matter to be determined by the court in each case by appropriate questions, and its decision is not open to review unless there be a clear abuse of judicial discretion.

*Appeal from Marion Circuit Court.*—HON. REUBEN F. ROY, Judge.

AFFIRMED.

*William R. Anderson* and *David Wallace* for appellant.

An examination of the record in this case discloses the fact that no copy of the indictment was ever given or served on the defendant or furnished to him. This is a requirement of the statute that could not be waived by the accused. The evidence is not, as a matter of law, sufficient to authorize the verdict. The shooting of the deceased by the accused was the result of a sudden quarrel, during which there was no time for deliberation. The facts do not authorize a verdict of murder in the first degree. *State v. Mitchell,* 64 Mo.

191; *State v. Dearing*, 65 Mo. 530; *State v. Gassert*, 4 Mo. App. 44. The record does not show whether the oath taken by the officer in charge of the jury was the special oath required by the statute or otherwise. The capacity of the infant Willie Stull as a witness was a question of fact which the judge determined upon the oral examination, which oral examination as embodied in the bill of exceptions, according to all recognized rules of law, showed the witness to be incompetent. *State v. Scanlan*, 58 Mo. 204. Believing that the evidence is not sufficient to authorize the verdict, and that the defendant was wrongly condemned to death, the court is respectfully asked, in addition to the above, to carefully examine all of the objections and reasons raised by the motions for new trial and in arrest of judgment, and reverse the judgment.

*R. F. Walker*, attorney general, *J. O. Allison*, prosecuting attorney, and *H. C. Heather* prosecuting attorney, for the state.

(1) It will be noticed from the reading of the motion for new trial, that no objections are made or preserved to any of the instructions given by the court; hence the defendant will not be heard to complain here, for the rule is now well established in this state that whatever errors may have occurred during the progress of the trial, must be called to the attention of the trial court in the motion for new trial, and thus give that court an opportunity to correct the same. *State v. Fitzgerald*, 130 Mo. 407; *State v. Kaiser*, 124 Mo. 664; *State v. Gilmore*, 110 Mo. 1; *State v. Nelson*, 101 Mo. 480; *State v. Day*, 100 Mo. 242. (2) It is charged in the motion for new trial that the court committed error in not giving the instructions required by law. It is presumed that defendant's counsel attempted to make the

point that the court had failed to instruct the jury upon
all questions of law arising in the case; however, this
assignment of alleged errors will not be reviewed here
for the reason that no exceptions were saved to the
failure of the court to so instruct the jury until the
motion for new trial was filed. This was too late.
*State v. Paxton*, 126 Mo. 515; *State v. Cantlin*, 118 Mo.
111. (3) It is complained that the requirements of
the statute that a certified copy of the indictment was
not served upon the defendant, and for this reason this
cause should be reversed. It will be seen from reading
the record that the defendant was arraigned on the first
day of September, 1893, and again arraigned on the
twenty-seventh day of March, 1894. There appears in
the record no demand for service of a copy of the
indictment. This being true, it will be deemed waived
in view of the fact that the defendant voluntarily
entered his two pleas of not guilty without objection.
*State v. Green*, 66 Mo. 631. He can not afterward
complain that he was required to plead without a copy
of the indictment. *Lisle v. State*, 6 Mo. 424. (4) No
error was committed by the court in admitting testi-
mony offered upon the part of the state. However that
may be, the action of the court will not be reviewed,
for the reason that proper objection was not made—no
reasons having been assigned. *State v. Moore*, 117 Mo.
401; *State v. Hope*, 100 Mo. 347; *State v. Harlan*, 130
Mo. 381. (5) The same may be said with reference
to the dying declarations of the deceased. *State v.
Harlan*, 130 Mo. 381; *State v. Moore*, 117 Mo. 401; *State
v. Hope*, 100 Mo. 347. They were, however, admissi-
ble. The testimony shows conclusively that deceased
was at the point of death and that he entertained a
well-founded belief and conviction of immediate disso-
lution. *State v. Wilson*, 121 Mo. 537; *State v. Nocton*,
121 Mo. 434; *State v. Johnson*, 118 Mo. 491; *State v.*

*Welsor*, 117 Mo. 570; *State v. Umble*, 115 Mo. 452; *State v. Crabtree*, 111 Mo. 136; *State v. Turlington*, 102 Mo. 642; *State v. Elkins*, 101 Mo. 351; *State v. Wensell*, 98 Mo. 139; *State v. Rider*, 90 Mo. 54; *State v. Chambers*, 87 Mo. 408; *State v. Jefferson*, 77 Mo. 551; *State v. Kilgore*, 70 Mo. 551; *State v. Draper*, 65 Mo. 355; 1 Greenlf. Ev., sec. 158. The dying declarations were of themselves proper. (6) The court very properly permitted Willie Stull to testify, as is shown by the qualifying examination of this witness, which shows the clear and just impression of all the facts of which he testified; in fact, from reading the testimony it is evident that he was remarkably bright and intelligent and understood clearly what matters he was testifying to. The capability of the witness to testify was a matter within the discretion of the trial court, and will not be reviewed here unless that discretion has been abused. *State v. Doyle*, 107 Mo. 42; *Ridenhour v. Railroad*, 102 Mo. 270; *State v. Scanlan*, 58 Mo. 204. (7) It is alleged as one of the errors said to have been committed, that the officer who took charge of the jury upon the trial here was not sworn as the law requires. Reference to the record, page 24, will show the falsity of this statement, which recites that upon the conclusion of the argument that the oath required by section 4210 of the Revised Statutes was administered to the sheriff and his deputies. Inasmuch as allegations in motions for new trial and in arrest do not prove themselves, this assignment of error should be adjudged against the appellant. *State v. Foster*, 115 Mo. 448.

SHERWOOD, J.—John Nelson and his wife Lavina were jointly indicted for the murder of John Stull in Ralls county on the fifth day of August, 1893; John was charged as principal and Lavina as accessory, and

the killing to have been done by shooting with a revolver.

The indictment, unobjectionable in form, was found at the August term, 1893, of the Ralls circuit court, and at that term defendants were arraigned, but the cause was continued till the March term, 1894, because of want of time to try the same. At that term, on the application of Lavina, a severance was granted, and the court ordered the cause set down for the second Monday in July, 1894. When that time arrived, John applied for and obtained a change of venue to Marion county. At the September term, 1894, a mistrial occurred, and the cause went over to the April term, 1895, when the cause was again tried, resulting in a conviction of murder in the first degree, and from this conviction and sentence and judgment accordingly defendant has appealed to this court.

The following evidence in substance was adduced at the trial: John Stull, the deceased, was, at the time of his death, living about one hundred yards south of Salt River Switch, a station or stopping place on the St. Louis & Hannibal railroad, about three miles north of New London and six miles south of Hannibal, in Ralls county, Missouri. The railroad at this point runs in a northerly and southerly direction, and the Hannibal and New London public road crosses the railroad at Salt River Switch, having at this point a northeasterly and southwesterly direction. John Stull's house was a small box house, one room below and a half story above, and a small shed room adjoining below, in which was stored at that time a lot of wheat in sacks. This house faced and was situated east of the railroad right of way; the railroad fence making the yard fence on the west side of Stull's yard, the house being about eighteen feet from the railroad fence at the nearest point. In the railroad fence, which was

wire, there was a gap, some of the wires being partly
drawn through, so persons could pass going in and out
of Stull's yard.    The railroad grade or dump at this
point opposite Stull's house is about ten feet high.
His family consisted of his old mother, Mrs. Hughes,
fifty-six years old, quite feeble and nearly blind, and
his daughter Mary, about fourteen years of age, who
at that time was on her way home from a neighbor's
house, where she had been at work, and his son
Willie, about seven years of age, at this time; his wife
having been dead for several years.    Here John Stull
had lived for several years, working hard to make an
honest living for himself and helpless family, always
bearing the name of an honest, upright, and peaceable
old citizen.

John Nelson, the defendant, and his wife, Lavina
Nelson, in the spring of 1893, located at Salt River
Switch, and pitched their tent about three hundred and
sixty feet south of John Stull's house and a little west
of the railroad grade.    Not long after, the defendant's
stepfather, Samuel Minor, and his wife, who was
defendant's mother, came in a covered wagon and
stopped their wagon right by the defendant's tent, in
which wagon old man Minor and his wife lived and
slept, cooking their meals on Nelson's stove and eating
them off of his table for awhile, but finally John Nel-
son and his wife fell out with his old mother, and
would not let her cook on their stove, nor eat on their
table; she was neglected generally, and being taken
sick in the covered wagon, received no attention nor
consideration whatever at the hands of John Nelson
and his wife, and finally they pulled the wagon with
the old lady in it, sick, away from the tent down into
a slough.    The neighbors came to her relief, and John
Stull, out of the kindness of his heart, consented, upon
the suggestion of neighbors and old man Minor, that

this sick woman might have shelter and attention in his house, so she was moved there and he gave her his best room and bed, and his old mother, Mrs. Hughes, ministered to her wants. Mrs. Minor was sick there at Stull's house about two weeks before the fifth of August, 1893, the doctor coming to see her, and the defendant and his wife never came to see her at all, or offered to come to see her, or to show any kindness or consideration at all, until Nelson and his wife and John Stull had had a quarrel, which took place about three days before the murder, in which quarrel Stull told Nelson and his wife never to come about him or his place. This quarrel took place over in the public road near Nelson's tent; after that Nelson pretended to want to come to the house, but the evidence shows that this was a false pretense, engendered by hate and malice toward Stull.

This quarrel came about in this way: On Wednesday, before the murder on Saturday, Stull's little boy Willie and a little boy of Stull's sister, Mrs. Ella McEntyre, who was visiting at Stull's house at that time, were over near Nelson's tent playing; that Nelson got the children in his yard or tent, and got them to fighting, and Mrs. McEntyre sent Stull's daughter, Mary, over to bring the children home, and Nelson cursed and abused her, and called her vile names, and Stull, being told of this, on the next day, when he was passing along the public road by Nelson's tent, taking his horses to water, saw Nelson and wife in the yard near the tent and asked Nelson why he had treated his children in that way, and abused his daughter so. Quite a war of words ensued. Nelson cursed and abused Stull, both got mad and Stull told Nelson and his wife that he did not want to have anything more to do with them, and for them never to come on his place. After this they seemed determined to go in defiance

of his protest; they had never shown any desire to come before this. This quarrel was on Thursday, and on Friday Nelson told a witness, Wax Hearn, that Stull would not let him come in his yard, but he was going in, and he would not be alone as long as his forty-four revolver held out; "that he was going in if he had to bore his way in."

The next morning, Saturday, August 5, 1893, true to his threat, Nelson and wife, their British bull dog revolver in hand, every chamber loaded, made their way over to Stull's house. They came into the house, Nelson carrying the revolver in his hand. Stull was not at home; no one told them to go or objected to their staying and ministering to the wants of their sick mother all that hot August day if they had so desired, she being sick in bed at the time. But they did not stay five minutes; not even to sit down. The evident reason was that Stull was not at home. Stull was away working on the public road with the road overseer, Joseph Blair, about four miles north of there. They went away remarking that they would be back that evening, Nelson still carrying the revolver in his hand.

They went up on the railroad grade, and north along the railroad about a mile to George Miller's camp, or tent, where Miller was engaged in chopping cord wood. When they got there Mrs. Nelson was carrying the revolver in her hand. Mrs. Miller told her to put it away, and it was put in a trunk. There all day Nelson and his wife in the presence of several witnesses threatened and abused Stull, threatened his life; said that Stull had told them to keep out of his yard, but "they were going in or have blood;" "that they were going back by there and go in or have blood." Nelson asked Samuel Dawson what time it was; Dawson took out his watch and told him it was a quarter to 6

o'clock.   Nelson remarked, "I want to get back at 6."   This was the usual time for Stull to get home from work, and Mrs. Nelson went to the trunk and got the revolver, remarking to Nelson, "Come on, honey, we will see fun before the sun goes down."   With threats on their lips against Stull's life and the revolver in their hands, they started south in the direction of Stull's house.

About 6 o'clock they were seen walking along the railroad track near Stull's house.   When they got opposite his house they went from the railroad grade or dump down into Stull's yard.   Stull had just gotten home from work and was sitting on his door step, resting from his hard day's work; his old mother, Mrs. Hughes, was in the house getting supper, just in the act of taking it up and putting it on the table.   Nelson and his wife could see Stull from the railroad track. Stull saw them start down the railroad dump toward his yard; he told them not to come in; they kept on coming and came into the yard.   Stull told them to get out; they kept on coming; all this time Nelson had his revolver in his hand and Mrs. Nelson had a heavy piece of iron in her hand, which she picked up as she crossed the yard fence.   Mrs. Hughes, hearing the difficulty, came out into the yard, evidently in the interest of peace, with the dish cloth in one hand and an old case knife in the other, which she had in her hand while in the act of taking up supper.   Mrs. Nelson assaulted Stull with the piece of iron, striking him on the head with it and inflicting a wound, and he returned a blow with his hand; then Nelson fired the first shot, which struck Mrs. Hughes, who fell speechless and almost lifeless, with a bullet hole in her head and her brains running out on the ground profusely.   She lived but a few hours.   Immediately after the first shot

Nelson fired again; the ball struck Stull in the abdomen, which staggered him; they turned and left the yard, going on to the railroad grade, Stull following them, and on the top of the grade he fell upon the track. Here Nelson hallooed out, "I have shot the damned son of a bitch."

Joseph Blair and Harry Michels, who were about one hundred yards west of Stull's house just after they saw Nelson and wife go into Stull's yard, heard the two shots and heard Stull call out: "O Joe, come quick!" and they went over and met Nelson and his wife at the top of the railroad dump. Nelson had the revolver in his hand, and when Blair went up to him, to arrest him and take the weapon away from him he made an attempt to shoot Blair, but by the assistance of Michels, they got the revolver away from him and sent for the sheriff. To several persons that evening Nelson said he did not give a damn if he had killed Stull, that if he had it to do over he would do it again, and that he was glad of it.

Nelson and his wife claimed that Stull had kicked Mrs. Nelson in the side and struck her in the face; that upon this defendant shot at Stull and missed him and killed Stull's mother; that thereupon Stull threw an iron piece which passed between defendant and his wife, and then came at them with a knife, when the defendant fired the second time and hit Stull, when defendant and his wife retreated to the railroad track, and were pursued by Stull with a knife in his hand. Stull fell on the railroad track, but neither Blair nor Michels found any knife in his hand or near him where he fell. Nelson and his wife denied that there had been a previous quarrel between Stull and them, or that Stull had forbade them to come on his premises or that they or either of them had made any threats against Stull, or that they had threatened to go to Stull's

house or into his yard,—but there is abundant evidence to the contrary.

They also testified that in consequence of the blows received from Stull, she was about to miscarry, that her nose was bleeding, and that she was vomiting as the result of such violence; but it was proved by various witnesses that while she was pretending to be hurt, that they could see nothing wrong with her, there were no marks or bruises about her, or any sign of injury or miscarriage; in fact, it was shown by several witnesses that night after the killing that she was seen running about over the neighborhood, taking long walks, which she could not have done if she was in the condition claimed, and two physicians who examined her a short time after the difficulty, testified that there were no signs of any injury or miscarriage, and she was safely delivered of a child some three months after the fifth day of August.

John Stull had no weapon of any kind in his hands or about his person; this is shown by a number of witnesses; none were seen on the ground about there, or on the railroad grade where Stull fell, or in the yard anywhere except the old table knife that Mrs. Hughes had in her hand, and the piece of iron that Mrs. Nelson carried. One witness, Alonzo Nelson, a relative of John Nelson, testified that he found a little old pocket knife not opened, and three or four cartridges and a piece of tobacco in Stull's pocket, after he was dead, while dressing him, but this was contradicted by other witnesses who helped to dress the deceased, and it was shown by a large number of witnesses that Stull had no knife at all. And on cross-examination, Alonzo was forced to admit that he only found ''a piece of tobacco and some cartridges'' in Stull's pocket.

John Stull in his dying declarations, which were made in appropriate circumstances, corroborated the

statements of his little son, one of the eyewitnesses of the fatal occurrence, as to Lavina striking him on the head with a piece of iron from a wagon, and his responding with a blow of his fist, he having no weapons, and as to John Nelson immediately shooting Stull's mother through the head and then shooting him through the body, etc.

Such, in brief, is the testimony which satisfied the traverse jury that defendant was guilty of a deliberate and most atrocious murder.

Various errors have been assigned as grounds for the reversal of the judgment, which alleged errors will now receive attention.

1. As no exceptions were saved in the motion for a new trial to the giving of instructions, it is quite out of the question to raise here for the first time any such point, as this court has so often decided. Aside from that, the instructions were far more favorable to defendant than he was entitled to.

2. The charge, however, is made in the motion for a new trial that the lower court "erred in not giving the instructions required by law." This was evidently intended to raise the point whether the trial court had done its duty under the fourth clause of section 4208, Revised Statutes, 1889. But this point can not be raised unless *at the time the failure occurs* to "instruct the jury upon all questions of law," etc., exception is saved to such failure. This was not done here. *State v. Cantlin*, 118 Mo. *loc. cit.* 111; *State v. Paxton*, 126 Mo. *loc. cit.* 515.

3. Complaint is made that the requirements of the statute, section 4138, Revised Statutes, 1889, were not observed in serving a copy of the indictment on defendant. Though this may be true, yet the default of the state in this regard has been waived by defendant, because of his failing to make timely objection,

and to save the matter by timely exception preserved in the bill. If a party pleads to the indictment in a capital case without making the objection now urged, he waives his statutory right and can not reassert it. This has been the rule in this state since *Lisle v. State*, 6 Mo. 426; *State v. Green*, 66 Mo. 631; *State v. Howard*, 118 Mo. 127.

4. If any error occurred in admitting evidence on the part of the state, the grounds of objection were not stated, and the bare objection, without more, amounts to nothing. *State v. Moore*, 117 Mo. 401; *State v. Harlan*, 130 Mo. 381.

Great latitude was allowed each side in this case in the introduction of testimony, ex gr.: Much time and space were consumed at the instance of defendant in determining whether Blair had on a certain occasion, two weeks before the fifth day of August, 1893, insulted Lavina; the words he used and whether she told her husband, and so on. But what such an investigation had to do with the issue joined between the state and John Nelson, it is beyond the power of the human imagination to conceive; but this so-called testimony encountered no objection on the part of the state, until the question was asked: "What was said by Joe Blair to you?" Then, to this answer and question "plaintiff" "*duly objected.*"

5. The statement is made in the motion in arrest that the record does not show whether the oath taken by the officer in charge of the jury was the special oath required by the statute. But this statement finds no support in the record, which expressly recites that "the oath required by section 4210, Revised Statutes of Missouri, having been administered to the sheriff and his deputies."

6. There was no error in admitting Willie Stull, the son of John Stull, to testify in the cause. Our statute,

section 8925, Revised Statutes, 1889, while it declares as "incompetent to testify," "a child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly," really fixes no *minimum* age at which an infant shall be regarded as incompetent to testify solely on account of his lack of years.

It is not unusual to receive the testimony of children under nine, and sometimes under seven, years of age if they appear to be of sufficient understanding; and it has been admitted even at the age of five years. 1 Greenleaf Ev. [14 Ed.], sec. 367. Indeed, there is no precise age at which children are competent or incompetent. Their competency is to be determined by their apparent capacity. It belongs to the judge in each case to determine by appropriate questions the competency of the infant offered as a witness, and his decision is not open to review unless there be a clear abuse of judicial discretion, or the witness be admitted or rejected upon an erroneous view of a legal principle. 3 Rice Ev., p. 289, *et seq.;* see, also, *State v. Scanlan,* 58 Mo. 204; *State v. Doyle,* 107 Mo. 42.

In this instance, the simple, straightforward, and childlike manner in which the boy of nine told his story of what had occurred nearly two years before, when his father and grandmother were shot down in their own dooryard, bears upon it the impress of truth, and fully justifies the judgment of the lower court in declaring the witness competent.

7. As to the assertion that the verdict is against the evidence, it is only necessary to advert to the outline of the testimony heretofore set forth. Of a case so entirely free as this one from any palliating circumstances, the criminal annals of jurisprudence scarcely afford an instance.

We affirm the judgment and direct the sentence pronounced to be executed. All concur.

In handing down this opinion, we can not forbear to speak in terms of highest commendation of the admirable manner in which the transcript of the record herein has been appropriately indexed and otherwise accurately prepared by the clerk, Mr. Richard A. Spencer.