State v. Westlake.

THE STATE v. WESTLAKE, Appellant.

|159    669|
|170   ³632|

Division Two, February 12, 1901.

1. **Former Conviction:** GENERAL OBJECTION. The defendant, who was being tried for shooting another, was asked if he had not previously been tried and convicted of shooting a man. The óbjection was, "We object," and the objection being overruled, an exception was saved. Then the objection was interposed that the question was incompetent, irrelevant and immaterial; that "if the defendant doesn't introduce evidence as to the good character of the defendant, the State can not produce evidence to the contrary," but no further exception was saved. *Held,* that the defendant, in the absence of a more specific objection and exception, must be held to have waived his objection to the question.

2. **Instruction On All Questions.** The statute requiring the court to instruct upon all questions, does not embrace the credibility of the defendant as a witness, and if no such instruction is asked by defendant on that subject, the trial court can not be convicted of error if it did not so instruct.

3. ————: NO EXCEPTIONS. If a defendant does not at the time the instructions are given except because the court has failed to instruct on all questions at issue in the case, he will on appeal be regarded as having waived any such objection.

4. ————: THREATS: APPREHENSION. The mere fact that the person killed may have threatened violence against defendant, does not justify the defendant in assaulting and killing him, but in order to do so there must be an actual attempt at an assault, or defendant must have good reason to believe deceased was then about to assault him or do him some great bodily harm. And if the evidence fails

to show any of these things, it is not error to refuse an instruction to the effect that, if the jury believe from the evidence that any threat had been made against defendant by deceased which had been communicated to defendant on the day of the shooting and prior thereto, such threat should be taken into consideration by them in determining the reasonableness of the apprehension by defendant that the deceased was about to do him some great bodily harm or take his life.

Appeal from Jackson Criminal Court.—*Hon. Jno. W. Wofford,* Judge, ·

AFFIRMED.

*Blake L. Woodson* and *E. E. Porterfield* for appellant.

(1) The court erred in refusing to allow defendant's counsel to make an opening statement to the jury. The jury was not permitted to hear the opening statement on behalf of defendant. If any parts of the opening statement were incompetent or irrelevant they should have been ruled out by the court or governed by instructions; but the court should have permitted a statement to be made to the jury. R. S. 1899, sec. 2627; State v. Honig, 78 Mo. 249; State v. Jackson, 105 Mo. 196; Thompson on Trials, sec. 933. (2) It was not competent for the prosecuting attorney to cross-examine the defendant upon any matter not referred to in his examination in chief. R. S. 1899, sec. 2627. The defendant's objection to the foregoing questions should have been sustained because no reference was made in his examination in chief to the matters referred to in this cross-examination. State v. Patterson, 88 Mo. 90. It is reversible error to compel a defendant in a felony case, when a witness in his own behalf, to answer on cross-examination over his objection as to a former conviction when not interrogated about it in his examination in chief.

State v. Westlake.

State v. Brent, 100 Mo. 531; State v. McGraw, 74 Mo. 573; State v. Turner, 76 Mo. 350; State v. McLaughlin, 76 Mo. 320; State v. Porter, 75 Mo. 171; State v. Douglass, 81 Mo. 231; State v. Nelson, 98 Mo. 414; State v. Kelso, 76 Mo. 505; State v. Taylor, 98 Mo. 240; State v. Loehr, 93 Mo. 103; State v. Minor, 117 Mo. 302; State v. Trott, 36 Mo. App. 35; State v. Rugan, 68 Mo. 214. (3) The error just complained of might and should have been remedied by instruction. The court failed to give an instruction limiting the testimony complained of to the matter of affecting the credibility of defendant as witness. It is the duty of the court to instruct the jury upon all questions of law arising in the case. State v. Jones, 61 Mo. 232; State v. Branstetter, 65 Mo. 149; State v. Wood, 137 Mo. 6; State v. Frazier, 137 Mo. 341; State v. Palmer, 88 Mo. 568, 573; State v. Taylor, 118 Mo. 153, 180; State v. Heinze, 66 Mo. App. 135. (4) Instruction 3 asked by the defendant, correctly declared the law of the case and should have been given. The evidence shows, and it is not disputed, that the deceased threatened the defendant about two hours before the shooting, and that the threat had been communicated to the defendant between the time it was made and the time of the shooting. The court should have instructed the jury that they should take such threat into consideration in determining the reasonableness of the apprehensions by the defendant that the deceased was about to do the defendant some great bodily harm, or to take his life. State v. Sloan, 47 Mo. 604; State v. Harris, 59 Mo. 550; State v. Elkins, 63 Mo. 159; State v. Rider, 90 Mo. 54; State v. Harris, 73 Mo. 287; State v. Harrod, 102 Mo. 590.

*Edward C. Crow,* Attorney-General and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

(1) The court did not refuse counsel for defendant the right to make an opening statement. In the transcript will be found the statement made by Mr. Porterfield on the part of the defense. The court struck out a part of the statement because of incompetency. The court said: "Mr. Porterfield, you can make any statement of the case that is relevant, but I will rule out what you have stated heretofore, except what I have told the jury they could consider." By Mr. Porterfield: "We have no further statement to make; we rest on that." It will be noticed that an opportunity was given defendant to make whatever statement he desired so long as he kept within proper bounds. He refused to make any further statement and is now in no condition to object. State v. Jackson, 105 Mo. 203. Nothing but a general objection was interposed. No reason for the objection was stated. This amounted to no objection at all. State v. Moore, 117 Mo. 395. (2) This court will not consider the question of the introduction of illegal evidence unless proper objections be made and exceptions be saved at the time. State v. McDonald, 85 Mo. 539; State v. Ray, 53 Mo. 345; State v. Buchler, 103 Mo. 203; State v. Smith, 114 Mo. 406; State v. Wisdom, 119 Mo. 539; State v. McCallom, 119 Mo. 469. (3) Defendant admits that the action of the trial court in permitting the cross-examination complained of was not reversible error, and might and should have been remedied by an instruction. Admitting that it was error and could be cured by an instruction, it was the duty of defendant to ask the instruction, or object to the action of the trial court in failing to instruct upon all questions of law arising in the case.

BURGESS, J.—On the ninth day of January, 1900, the defendant shot and killed with a shotgun at Jackson county one Wood Mitchell, for which he was thereafter indicted by

the grand jury of said county and charged with murder in the
first degree.   Thereafter at the April term, 1900, of said
court, he was put upon his trial, and convicted of murder in
the second degree and his punishment fixed at fifty years'
imprisonment in the state penitentiary.   He appeals.

   The facts briefly stated are, that at the time of the homi-
cide, defendant lived on a farm in said county, which be-
longed to one Clinton D. French, and had in his custody a
lot of hogs and other personal property belonging to him. The
farm had recently theretofore been occupied by one Moore,
who had executed a chattel mortgage upon the hogs to Mrs.
W. A. Moore, which was transferred to the J. H. North Furni-
ture & Carpet Company, a business firm at Kansas City.   The
deceased Mitchell was an attorney at law.   On the morning of
the ninth of January, 1900, Mitchell went to the farm upon
which defendant then resided to make arrangements to recover
the hogs, and for that purpose took with him a deputy con-
stable, who had a writ of replevin for the hogs which had
been sued out by the J. H. North Furniture & Carpet Com-
pany before a justice of the peace in Kansas City.

   On the morning of the difficulty in a conversation de-
ceased had with one John Fred, Fred said to him, "If you go
down to get those hogs and meet that man Westlake as a gen-
tleman, he will meet you half way, but if you don't you are
liable to have trouble."   Deceased replied, "I will show that
big stiff a trick that he has never learned," etc.   This was
communicated to defendant before the shooting.   As deceased
and the deputy constable Sherman were walking across a field
towards the house of defendant, he observed them, and
immediately went to his house, got his shotgun, stationed him-
self in front of a wire which was stretched across the passage
way leading into his yard, and waited until deceased and
Sherman came walking up, and had gotten within about twelve

Vol 159 mo—43

feet of defendant when he admonished them, at least once, and perhaps twice, not to come in, but they made no halt, and defendant at once fired his gun at Mitchell killing him instantly. The deceased and Sherman made no attempt to assault defendant, or to harm him in any way. Defendant did not know that Sherman was an officer, or that he had a writ of replevin in his possession at the time he shot the deceased.

Defendant, in his own behalf, testified as follows: "I went to Grand View from my place late in the forenoon, and shortly before the shooting; it was some little time before noon. I was there with Mr. Irwin. That was on the ninth day of January, 1900. I went after my mail and called up Mr. French who owned the place on which I lived and talked with him over the telephone; I was not there but a few minutes. I saw two men coming from the north and turn across the field east towards my place; they were coming from towards the Phelan house; I started with Mr. Irwin towards home; I wanted to get down there and see who they were; I wanted to see if they were going down there to the place and what they wanted, whether they wanted to take the property, and if they were officers. I wanted to see that they didn't take anything away unless they had a writ of replevin. I didn't know who they were, but I thought one of them was Vic Moore; he is the son of W. A. Moore, who was a former tenant on the farm before I took charge of it. I went straight home, walked pretty fast and went to the house and got my gun; I came out and stood in the yard close to the fence; I supposed six or eight feet from the wire; I think I had my gun in my left hand when I first spoke to the deceased; he was about ninety or a hundred feet away from me. I recognized Mitchell when I first spoke, the other man I had never seen before; the first thing I said to him was, 'you can't come

in here, so go back,' but he came right on towards me and
started across the road and I said to him, 'You are no officer
and you can't come in.'   From the talk I heard that morning
I was suspicious of him, as I was of other people in the neigh-
borhood.   What I mean by this, I had talked with Mr. Fred
and he had told me what the deceased had said; it was to learn
me a trick that I had never heard or never knew; I feared it
was something that wasn't very pleasant.   It caused me to
think I was in danger from being in company with parties
that had threatened me.   I supposed I was liable to be killed
almost any time.   When he turned directly towards me, I
cocked my gun and put it to my shoulder and commenced tell-
ing him to stop.   I told him he was no officer and couldn't
come in; he looked vicious and made no answer; neither one
answered nor said a word, but he came right on to me while
the other man walked around and passed about ten feet from
me; I didn't notice the other man particularly because I had
heard nothing that he had said; I was watching Mitchell.   I
knew he was not an officer; Mitchell told me he was an attor-
ney for the North Furniture Company.   When he came to-
wards me I holloed for him to stop very loud and with as
much force as I could; I did this to make him think he was in
danger if he came on or made me an answer.   I told him to
turn back before I drew the gun on him; I told him he was no
officer and couldn't come in; I told him two or three times; I
will not be positive which; just called to him to stop as he
came near me; I just called to him to stop.   Deceased had on
his overcoat which was rather long, and kinder lent over a lit-
tle; just at the time I shot he moved the coat kinder forward;
and I inferred from the movement he intended to shoot from
his pocket; I have often heard of people shooting from the
pocket that way; I have known of one or two people to do it.
I shot simply because from his looks and his action I thought

he intended to shoot me; that is just the reason I shot; I think he was about twelve feet from me when I shot; he didn't slacken his speed any, but came fully as fast as he had been coming; I looked to see if there was any badge of an officer; he never spoke a word, and I thought he had plenty of time to tell me if he were an officer. If they were not officers they were not there on any peaceable mission at all. By Mr. Sherman going south of me it looked to me like he was to get on the opposite side so they would have me between two fires. I brought the gun out from the house because I thought perhaps I would need it to protect myself; I thought one of these men was Moore; that is the reason I got my gun, I thought one of them was Moore. What Mr. Fred had told me about Mr. Mitchell had the effect of making me judge him to be with Moore, and he would do the same they would and I was satisfied they would kill me if they got a chance; I thought he would do the same."

The defense interposed was that of self-defense.

The point is made that the court committed error in refusing to allow defendant's counsel to make an opening statement of the case to the jury.

But this contention is not, we think, borne out by the record, which shows that the court did not refuse to permit defendant to make a statement of the facts relied upon by him as tending to show that Mitchell at the time of the shooting was approaching defendant in a hostile manner, and that he shot him in self-defense, but only to show such facts as were in the opinion of the court illegal, improper, irrelevant and incompetent, and which evidence to support would not have been admissible. The court also announced to defendant that he could make any statement of the case that was relevant, than which nothing more could have been desired or expected.

During the cross-examination of defendant as a witness the following occurred.

State v. Westlake.

"Q.   You were tried for killing a man once before?   A. No, sir; I wasn't.

"Q.   Weren't you convicted for shooting a man?   A. No, sir; I wasn't, I never shot anybody in my life.

"Q.   Weren't you convicted of shooting at a man?

"By Mr. Woodson:   We object to it.

"By the Court:   Objection overruled.

"By Mr. Woodson:   We except.

"By Mr. Porterfield:   The defendant objects to the question as incompetent—the record is the best evidence—irrelevant and immaterial; if the defendant doesn't introduce evidence as to the good character of the defendant, the State can't produce evidence to the contrary, and because the defendant can not be cross-examined as to matters not touched upon in his direct examination.

"By the Court:   Overruled by the court for the reason that the defendant, when he becomes a witness and places himself on the witness stand, he places himself in the same position as any other witness and is subject to the same cross-examination exactly.

"A.   I was convicted of shooting; but not shooting at him; I didn't shoot at him; I got out of it all right without any further trouble.

"Q.   You were convicted of shooting?   A.   Yes, sir.

"Q.   Shooting at a man?   A.   I didn't shoot at him, he was an old man.

"Q.   You were convicted of shooting at him with the intent to kill?   A.   He was an old man who annoyed me and my folks a great deal.

"Q.   You were convicted of shooting at the man with intent to kill?   A.   That was the verdict of the jury when they found out the circumstances; the prosecutor wrote to the Governor that a $500 fine would have been the limit at the start, after they learned the circumstances."

State v. Westlake.

As the subject of this cross-examination was not adverted to in the examination in chief of the defendant, it is claimed that it was improper, and should not have been permitted. It will be observed, however, that no objection was made to the first two questions, and that no exception was saved to the ruling of the court as to the others with the exception of the third, the objection to which was in these words, "We object to it."

It is well settled that in order that a party to a suit may take advantage of the adverse ruling of the court in the admission of evidence against him he must not only make timely objection to the admission of such evidence, stating the grounds therefor, if it be admissible for any purpose, but he must except to the ruling of the court at the time and save his exception. Now, the only objection made to which an exception was saved to the ruling of the court, was a general one, without a stating upon what ground the objection was based, whether because the question was improper on the cross-examination of defendant for the reason that he had not in his examination in chief been examined in regard to such matter, or upon some other ground. We can not presume that it was one or the other, for in either case defendant could have waived the objection if he had been so inclined, and in the absence of more specific objection, he must be held to have done so.

Moreover, defendant's counsel concedes that this error, if one, could have been remedied by instruction restricting the testimony to the credibility of defendant as a witness. But no such instruction was asked by defendant, and while it is true that section 2627, Revised Statutes 1899, makes it the duty of the court to instruct the jury on all questions of law, etc., this does not embrace the credibility of defendant as a witness. But in any event as defendant did not at the time the instructions were given, except because the court had failed

to instruct upon all questions at issue in the case, he must be regarded as having waived the same and will not now be heard to complain.    [State v. Cantlin, 118 Mo. loc. cit. 111; State v. Paxton, 126 Mo. 500; State v. Nelson, 132 Mo. 184; State v. Hilsabeck, 132 Mo. 348; State v. Frazier, 137 Mo. 317.]

Defendant claims that the court erred in refusing the third instruction asked by him to the effect that, if they believed from the evidence that any threat had been made against the defendant by the deceased, which had been communicated to defendant on the day of the shooting and prior thereto, such threat should be taken into consideration by them in determining the reasonableness of the apprehensions by defendant that the deceased was about to do the defendant some great bodily harm or take his life.

We are unable to conceive, under the facts disclosed by the record, how the defendant could have been prejudiced by the refusal of this instruction.  The mere fact that Mitchell may have threatened violence against defendant did not justify the defendant in assaulting and killing him, but in order to have done so there must have been an actual attempt at assault, or defendant must have had good reason to believe that deceased was then about to assault him or to do him some great bodily harm and the evidence failed to show that deceased was making any attempt to assault defendant or to do him great bodily harm at the time he fired the fatal shot.

While evidence of threats is usually admissible in cases of assault as tending to show who was the aggressor, we do not wish to be understood as holding that it is the duty of the court to instruct to that effect.

The facts disclosed by the record did not justify an instruction for manslaughter in any degree; for if the evidence was to be believed defendant was guilty of murder in the first or second degree.

The instructions which were given were as a rule in form often approved by this court, free from substantial objection, and presented the case fairly to the jury. Nor was error committed in refusing instructions asked by defendant.

Finding no reversible error in the record we affirm the judgment. *Sherwood, P. J.,* and *Gantt, J.,* concur.