State v. Crone.

THE STATE v. ALBERT M. CRONE, Appellant.

**Division Two, February 18, 1908.**

1. DYING DECLARATIONS: Affirmative Ruling Thereon.  The fact that the court sent the jury from the room when evidence was offered by the State tending to show dying declarations by the deceased, and heard the evidence in respect thereto, and then had the jury recalled and allowed the evidence to be submitted to them, was equivalent to an affirmative ruling by the court that such declarations were primarily admissible.

2. ————: ————: Instruction: Asked by Defendant: Nothing Else Left for Him to Do.  The instruction given in this case admits in no uncertain language that the statement made by deceased to her mother was a dying declaration, and tells them the facts necessary to be found by them to constitute it a dying declaration and the proper weight to be given to it, and having been asked by defendant he cannot convict the trial court of error in giving it on the ground that "there was nothing left for him to do but to obtain the most favorable instruction possible upon the theory of law advanced by the court" that the dying declaration "is finally left to the jury and I think under the testimony I should let it go to them."

3. **HEARSAY: Objection: Incompetent.** An objection that proffered testimony is incompetent, irrelevant and immaterial, amounts to no objection at all, and hence where this was the only objection made to the testimony of witnesses to the effect that a witness who was with deceased at the time she was assaulted had made statements connecting defendant with the assault, the Supreme Court cannot consider the competency of their testimony.

4. **CIRCUMSTANTIAL EVIDENCE: No Instruction.** It is only where the State relies upon circumstantial evidence alone that an instruction on such evidence should be given. So where the deceased made a dying declaration that it was defendant who assaulted her, and the young man who was with her said the assault was committed by defendant, although he had often contradicted that statement before testifying, yet, the credibility of his testimony being for the jury, the court did not err in refusing to give an instruction on circumstantial evidence.

Appeal from Jackson Criminal Court.—*Hon. B. J. Casteel,* Special Judge.


AFFIRMED.


*Harlan, Jeffries, Wagner & Corum* for appellant.

(1)    The court erred in admitting the declarations of deceased in evidence.    The statements of the mother were admitted on the theory, we presume, that it was a dying declaration, but how it can be so interpreted we do not understand.    It appears that the mother asked deceased two questions in one sentence, (1) If she were going to get well, and (2) if she (deceased) were going home with her.    The record shows that deceased replied, "uh uh."    Now, in the first place, it appears to us that the answer was affirmative; that deceased signified her belief that she was going to get well.    But if not an affirmative answer, it certainly cannot be distorted into a negative one. Construed most favorably for the State, it cannot be said to amount to anything more than a grunt, and how such an answer as deceased made could be con-

strued by any court that there was an absolute conviction in the mind of declarant that death was imminent, we cannot conceive. There is no evidence that deceased made any preparation for death—no evidence that she was under the impression that the end of her life was near—no evidence even of consciousness on her part—she was terribly wounded—in such condition that the medical men who testified as experts relative to it, were of the opinion that one wounded as she was could not have a lucid interval. And the nurses who attended her while at the hospital were of the opinion that she was not rational at any time. Before declarations of this character can be introduced in evidence, it must be affirmatively shown and must clearly appear that the statement offered in evidence was made under a full realization that the solemn hour of death has come and the court must be satisfied that the declaration was made under an impression of almost immediate dissolution; there must not merely be an actual nearness of death, but there must be an absolute conviction in the mind of the declarant that death is impending and almost immediate. The declarations introduced in this case do not meet any of requirements of the law. State v. Simon, 50 Mo. 374; State v. Johnson, 118 Mo. 491; State v. Parker, 90 Mo. 629. (2) The question whether a dying declaration is made under a sense of impending death is for the court. The court here did not pass upon the admissibility of this evidence. That is made clearly manifest from the remarks of the learned trial judge. That the court did not intend to pass on the admissibility of this evidence and that he intended to leave it, and did leave it to the jury, is clear. Defendant was clearly entitled to the judgment of the trial court upon this preliminary question. State v. Zorn, 202 Mo. 12; State v. Simon, 50 Mo. 370; State v. McCanon, 51 Mo. 160. (3) The court should have instructed on circumstantial evi-

dence.  The evidence was largely circumstantial.  The only direct evidence that defendant committed the crime was the testimony of Kern.   And on account of his benighted mental vision, due, probably, from the serious wounds he received, or to some other cause, his testimony was not entitled to any consideration whatever.   His testimony, standing alone, carried no conviction with it.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for the State.

(1)    The court did not err in refusing an instruction on circumstantial evidence.    State v. Donnelly, 130 Mo. 649.  ·  (2) The court did not err in admitting in evidence, over the objection of defendant, the dying declaration of deceased.   It appears in evidence that deceased was conscious, recognized her mother, stated that she was almost dead, and when asked if she was going to get well and go home with her mother, she answered, ''No,'' and answered in the affirmative a question as to whether or not she was going to die.   In this condition and under these circumstances, she repeated three or four times that the person who struck her was Bert Crone.   The fact that declarant was in great pain and at times unconscious and taking opiates, would not make the declaration incompetent.   4 Ency. Ev., p. 934.    The evidence clearly shows that declarant was *in extremis* and made the declaration under the belief of impending death. She could not talk plainly on account of the injury to her mouth and face, but at different times she was rational and recognized and spoke to those who were present, though with difficulty.    1 Greenl. Ev. (14 Ed.), sec. 158.

BURGESS, J.—At the September term, 1906 of the criminal court of Jackson county, the prosecuting

attorney of said county filed an information charging the defendant with having killed and murdered one Bertha Bowlin, at said county, on the 19th day of July, 1906. For want of time to try the cause, the court ordered it continued, and set the same for trial on the 4th day of February, 1907. On the 10th day of January, 1907, at the January term of said court, the defendant filed a demurrer to the information, also a motion to quash, which demurrer and motion to quash were overruled by the court, exceptions to such rulings being saved by the defendant. At the same term the defendant filed an application for a change of venue from the judge of said court, which was granted, and the court ordered that the Honorable B. J. Casteel, judge of the criminal court of Buchanan county, be requested to sit as special judge in the trial of the cause, before which said special judge, at said January term of said court, the defendant was put upon his trial, convicted of murder in the second degree, and his punishment assessed at eighteen years in the penitentiary. The defendant filed motions for a new trial and in arrest of judgment, which were overruled, whereupon he appealed to this court.

The deceased, Bertha Bowlin, was an unmarried woman, about twenty-one years of age, and resided at No. 1014 Jefferson street, Kansas City, Missouri, with her mother, a widow, who sewed for a livelihood, and lived with her family in a few rooms of the house which she had rented, the remainder of the house being sub-rented by her to other families who occupied the same. The house was near the summit of a bluff or bluffs which front west, toward the Kaw river, a short distance from the boundary line between this State and the State of Kansas. Near the home of the deceased was a driveway called the Kersey Coates Driveway, built by the city, beginning near the intersection of Twelfth and Jefferson streets, and extending in a

southerly direction along the side of the bluffs to Seventeenth street, a distance of about half a mile. On the east side of the driveway, which was about fifty feet wide, there was a gutter and curb, and between the curb and an acclivity on that side there was a strip of grass from fifteen to twenty feet in width. On the same side of the driveway, near where the extension of Fourteenth street would have intersected it, there was a catch-basin, and about 150 yards east was an electric light which shed some light on the west side of the driveway, leaving the east side, near the catch-basin, in the shadow. West of the driveway, and between it and a precipitous bluff, was a narrow strip of ground used as a sidewalk.

The defendant lived with his parents at No. 1407 Madison street, in said city, a few blocks distant from the home of the deceased, and was about twenty years of age at the time of the homicide. He had known the deceased for a number of years, was much in her company, had become jealous of her affections and intolerant of rivalry. He became dissipated and dissolute in his habits, a frequenter of saloons and bawdy-houses, and, according to his own statement, the first time he met the deceased was in a house of ill-fame. The year before the homicide, Mrs. Bowlin, mother of the deceased, refused to permit the defendant to enter her house to see her daughter. At this he became very angry, and threw bricks at the door and through a window of the house, one of the bricks striking Miss Bowlin, the deceased, on the arm. He threatened to kill her many times if he saw her with another, and told her if she could not go with him she could not go with anyone else. He violently assaulted her upon two occasions. Once, in the presence of witnesses, he knocked her down with a brick, and while she was prostrate on the ground he bent over her and beat her

with his fists, at the same time calling her vile names and threatening to kill her. In October and November, 1905, while in the State of California, the defendant wrote deceased letters which were read in evidence, and in which he made threats as to what he would do if he found her in another's company. In one of these letters he upbraided her for going with another, and said, "I am only 1,750 miles from home, but can make it in a short time. You know I am not coming 1,750 miles for nothing, and you will find it out;" and again, "As sure as I come back to Kansas City and I ever see you I would have to talk to you, and there would be some trouble in sight, and that would be just what I would want; just for a minute or two, and then it would be all over." He came back to Kansas City, and, as he had threatened, made an assault upon the deceased, after which assault he wrote her a letter, dated December 14, 1905, in which he said: "I leave to-night for Las Vegas, New Mexico, now I think we are about even. I think you done me dirty, and I was only getting even."

Frank Kern, who was with the deceased at the time of the homicide and who was also violently assaulted, lived with his parents in apartments rented from Mrs. Bowlin, in the same house in which the latter resided. In the summer of 1906, Kern commenced paying attention to Miss Bowlin, and walked out with her occasionally. He had seen the defendant a number of times, and knew him by sight, and had seen him in a drunken condition in front of Mrs. Bowlin's house shortly before the homicide. About eight o'clock on the evening of the 19th of July, 1906, Kern and his two brothers were out walking when he saw Miss Bowlin at Twelfth and Summit streets, near their home. As he started across the street to join Miss Bowlin, he saw the defendant standing on the street corner, recognized him plainly, and the defendant said,

"Hello." Kern and the girl walked south on the driveway, and sat down on the catch-basin heretofore mentioned. It was not yet quite dark. They sat there talking for about half an hour, during which time several persons passed and saw them. When it was getting dark two men, one of whom was the defendant, were seen walking in the direction of, and near to, the place where Kern and Miss Bowlin were sitting. Two witnesses who saw the defendant at the time and place stated, and who did not know him by name at the time, afterwards identified him, and picked him out of a number of prisoners at the county jail without hesitancy. One of the two men seen going in the direction of the catch-basin was carrying what appeared to be a cane, but which resembled a piece of gaspipe found near the scene of the homicide, and which was offered in evidence as the weapon with which the homicide was committed. The night before the homicide, one of the defendant's associates saw him standing by the curbstone, not far from Miss Bowlin's home, and when he asked the defendant to go and take a drink, the latter said: "No, Mack, I have a gaspipe here, and I am going to get a guy with it." One of the State's witnesses, however, a street car conductor, testified that on the evening of the homicide he saw two men at Twelfth and Washington streets, not far from the driveway, one of whom was carrying a piece of gaspipe and using it as a cane. The witness got into conversation with the man, and the later said: "If you had a sweetheart, and was gone away a long time and had come back, and there was another man going with her and lying on you, wouldn't you beat him and beat him until you beat him to death?" He also heard the man say to the other man, who was standing on the opposite corner of the street, "Come on, Henry; let us go." Henry replied, "Go back to the Tralle," and witness further heard Henry

say, "We will get them on the drive." The conductor, however, testified that he knew the defendant, he having seen him on his car, and that he was not the man with whom he had the said conversation. It developed during the trial that one Charles Henry was an associate of the defendant, and was also charged with the murder of the young woman.

As Kern and Miss Bowlin were starting to go home, Kern was struck on the side of the head from behind. He turned and grappled with his assailant, but another seized him by the shoulder, and he was again struck and rendered unconscious by the blow. He recognized the defendant as the man he saw and grappled with at the time. About nine o'clock, the night of the homicide, a dog belonging to a Mr. Newcomb, and chained back of his house, near the foot of the bluffs, below the catch-basin, broke loose twice and ran off in the direction of the place where Miss Bowlin was found next morning. Mr. Newcomb went after his dog each time and brought him back, on one of which occasions he saw two men running north from near the point where the young woman was found. About daybreak, next morning, a boy found Miss Bowlin, almost unconscious, lying on the wet, muddy ground, at the foot of the bluffs, below the catch-basin. Her face was covered with blood, her clothes smeared with mud, and though still alive, she was unable to do more than move her head a little. She was taken to the hospital, where she died next day at about one p. m., having lived about thirty-six hours after she was found, fatally wounded. At the hospital she called for her mother, who soon came and remained with her until her death. She recognized her mother, and in answer to a question as to who struck her, answered, "Bert Crone," and kept repeating the word "Bert," which was the name by which the defendant was known.

The post-mortem examination disclosed a fracture of the skull, above the left ear. A piece of bone an inch and a half wide and two and a quarter inches long was crushed in and found loose and detached from the surrounding bone of the skull. Her face was crushed or caved in, her nose broken, and her left arm, between the elbow and wrist, broken and hanging loose. The attending physicians testified that death was caused by the fracture of the skull and the resulting hemorrhage of the brain.

It does not appear in the record where Kern was found, but it does appear that he was rendered unconscious by the blow on the head, and that he was brought to the hospital in an unconscious condition a half hour later than the deceased; that there was a fracture of the skull, near the base, causing a hemorrhage from both ears, and that he did not regain consciousness for about two weeks. Kern was interviewed and harassed a good deal, after he left the hosiptal, by the defendant's attorneys and others, to whom he made conflicting statements, and stated on one or two occasions that Crone was not the man who assaulted him. At the trial, however, he stated that he had received threatening letters, and positively identified the defendant as his assailant.

The defendant was a witness in his own behalf, and testified that he went to a saloon called the Tralle saloon, owned by Thomas Tralle, in said city, a little before six o'clock the evening of the homicide, and remained there drinking and playing cards until after midnight. In this statement he was corroborated by several of the attaches of the saloon. It was in evidence that there was a large number of men in the saloon that evening and night, but, besides the men who were employed in and about the saloon, the only witnesses who testified to seeing the defendant in the saloon that evening were James Pigg and Clarence B.

Fuller. The former testified that he saw the defendant in the saloon about six o'clock, and the latter, who was a friend of the defendant, testified that he went to the saloon about 9:15 o'clock that evening, and saw the defendant playing cards there, and that the defendant was still in the saloon when witness left, at about 11:45 p. m.

It is claimed by defendant that the court erred in admitting in evidence, over the objection of the defendant, testimony as to statements made by the deceased a few hours before she died, to the effect that the defendant assaulted her as charged in the information, without having, first, passed upon its admissibility.

The record shows that Mrs. Mattie Bowlin, mother of the deceased, testified as a witness in behalf of the State, and after testifying that she was with her daughter, the deceased, at the hospital the morning after the assault, remaining with her until next day, and that her daughter recognized and talked some with her, the witness was asked by the attorney for the State if she had a conversation with her daughter and heard her "say anything about whether or not she felt that she could get well." Counsel for defendant objected to the question on the ground that it was suggestive and said that the proper way to inquire would be to ask what was said. Thereupon the court said: "I think possibly this ought to be made in the absence of the jury." The jury was then withdrawn from the courtroom, and the examination of the witness proceeded with. To the last question propounded to her, she answered, "Yes, sir." She then made a detailed statement of what occurred between herself and the deceased at the hospital, and was cross-examined by defendant's counsel. Mr. Whitsett, of counsel for defendant, finally announced that he did not want to cross-examine the witness further on this point. The

prosecuting attorney then excused Mrs. Bowlin for the time being, the jury returned to their places, and the trial proceeded. Thereafter Mrs. Bowlin was recalled and the following ensued:

"Q. You said yesterday you had a talk with your daughter before she died? A. Yes, sir.

"Q. Tell the jury what conversation you had with your daughter about her condition. A. I asked her how she felt; she said awful bad. I asked her if she wasn't going to get well and go home with me. She said, 'Uh, uh.' I asked her if she was going to die. She said, 'Uh, uh.' I asked her if she couldn't open her mouth and tell me who it was that hit her and hurt her so badly last night. She said, 'Hu, hu.' I said, 'Who was it?' She said, 'Bert.' I said, 'Bert who?' She said, 'Bert Crone.' I said, 'Bert did this, Dovie?' She said, 'Sure.' She emphasized it.

"Q. What was the condition of her mouth? A. The upper lip was cut through, and the jaw bone was fractured, and that made her teeth a little loose. That kept her from talking very distinctly at times; at times she could push her teeth up, and she could speak as distinctly as I am."

The fact that the court sent the jury from the room where the case was being tried when evidence was offered by the State tending to show dying declarations by the deceased, and heard the evidence with respect thereto, and then had the jury recalled and allowed the evidence to be submitted to them, was equivalent to an affirmative ruling by the court that such declarations were primarily admissible. Moreover, in the absence of the jury, the court remarked: "This is a matter that is *finally* left to the jury, and I think under the testimony, I should let it (that is, the dying declaration) go to the jury;" and thereupon the court directed the return of the jury, and the evidence with respect to said declarations was submitted to them, with all

other evidence in the case. The court would not have used the word "finally" if he had not already held the evidence admissible.

We recognize the rule upon this subject announced in State v. Zorn, 202 Mo. 12; State v. Simon, 50 Mo. 370, and State v. McCanon, 51 Mo. 160, to the effect that whether or not dying declarations offered in evidence are in fact dying declarations, and admissible as such, is a question to be passed upon by the court. In this instance, that is what the court did. Not only this, but upon this question the defendant asked and the court gave the following instruction:

"8. The court instructs you that the statement put in proof by the State claimed to have been made by Bertha Bowlin on the morning of the day upon which she died, was competent evidence, if the jury find and believe that at the time she made such statement (if you find that she did make such statement) she was suffering from the wounds of which she subsequently died, and that at the time of making such statement believed that death was imminent and near at hand and had given up all hope of recovery, and if you further believe from the evidence that said Bertha Bowlin, at the time of making such statement, if you find she did make such statement, her mind was clear, and that she was able to recall the circumstances attending the infliction of the injury upon her, and that she knew what she was doing, and it would be your duty to consider such statement as the dying declaration of the said Bertha Bowlin, and you should give it such weight as you justly think it entitled to upon a consideration of it along with all the other facts and circumstances disclosed by the evidence in the case. You should consider, however, that such statement was not made in the presence of the defendant, that the declarant was not subject to cross-examination by the defendant, or counsel for him, and that the jury had no

opportunity to observe the manner of the deceased at the time such statement was made, and that she was not subject to prosecution for perjury if such statement, or any part of it, is untrue, and if the jury believe from the evidence that the deceased at any other time or times made statements contradictory of or inconsistent with such dying declaration (if the jury believe from the evidence such dying declarations were made), or that she was laboring under the influence of drugs administered to alleviate her condition to such an extent as to cloud her mind, then such contradictory or inconsistent statement and her condition at the time of making the statement introduced in evidence should be considered by the jury in determining the weight to be given to such dying declaration."

This instruction admits in no uncertain language that the statement made by the deceased on the morning of the day upon which she died was competent evidence, and then proceeds to tell the jury the facts necessary to be found by them to constitute a dying declaration, and the weight to be given it by them in passing upon the guilt or innocence of the defendant. This instruction having been given at defendant's request, he cannot now convict the court of error upon the ground that "there was nothing left for him to do but to obtain the most favorable instructions possible upon the theory of law advanced by the court."

Defendant claims that error was committed in permitting the State to introduce witnesses to testify as to what Kern, a witness for the State, had told them with reference to the homicide. Kern was in the company of the deceased at the time she was assaulted, and was also assaulted at the same time by the same person or persons, and seriously injured. He testified that he recognized the defendant as one of the assailants, and, according to the testimony of other witnesses, he made the same

statement to them immediately upon his return to consciousness after the assault upon him. On cross-examination, he was asked if he had not stated at different times that he did not know either of the persons who made the assault, and admitted that he had so stated. On re-direct examination, he explained such contradictory statements by saying that he had received threatening letters, and that the attorneys and friends of the defendant had been annoying him with inquiries as to what he knew, and that he decided to tell them what he did, intending to tell the facts when placed upon the witness stand.

Several of the State's witnesses testified, over the objections of the defendant, to statements made by Kern connecting the defendant with the assault, but the objection made to the admission of the testimony, in every instance, was to the effect that it was "incompetent, irrelevant and immaterial." It has been many times held by this court that such an objection is too indefinite and uncertain, and counts for no objection at all. [State v. Wright, 134 Mo. 404; State v. Moore, 117 Mo. 395; State v. Harlan, 130 Mo. 381; State v. Nelson, 132 Mo. 184.]

A final contention is that the court should have instructed on circumstantial evidence. This insistence is not bottomed upon the theory that there was no direct evidence that the defendant committed the assault, but upon the theory that Kern's was the only direct evidence, and that he was shown to be unworthy of belief. We are unable to assent to this. In the first place, we do not think Kern was impeached; besides, his credibility as a witness was for the consideration of the jury under the circumstances in proof. In the second place, this was not the only evidence of the assault, for, in addition thereto, the murdered girl stated to her mother on the morning of the day upon which she died that Bert Crone did it, and the court, at the re-

quest of the defendant, instructed the jury that the statement by the dying girl as testified to by her mother was competent evidence. So that the court, either under the testimony of Kern or the statement of the deceased to her mother, was justified in refusing to instruct upon circumstantial evidence. While there was considerable circumstantial evidence upon the part of the State tending to show that defendant was guilty of the crime charged against him, it is only when the State relies upon circumstantial evidence alone that an instruction on such evidence should be given. [State v. Moxley, 102 Mo. 374; State v. Robinson, 117 Mo. 649; State v. Donnelly, 130 Mo. 642; State v. Maxwell, 42 Iowa 208.]

The murder was a most brutal one, and the evidence proves beyond question that defendant committed it, wilfully, deliberately and premeditatedly.

Finding no reversible error in the record, the judgment is affirmed. All concur.